UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

REGINA LEWIS,

                              Plaintiff,

        v.

ELLEN HUEBNER, *et al.*,

                              Defendants.

No. 17-CV-8101 (KMK)

OPINION & ORDER

Appearances:

Regina Lewis
Newburgh, NY
*Pro Se Plaintiff*

Antwaun Gavins, Esq.
New York State Office of the Attorney General
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Plaintiff Regina Lewis ("Plaintiff") brings this pro se Action, under 42 U.S.C. § 1983,

against Nurses Ellen Huebner ("Huebner") and Lisa Wallace ("Wallace"), and Security Hospital

Treatment Assistants ("SHTAs") MaryAnn Franqui ("Franqui"), Barry Marlow ("Marlow"), and

Edward Campbell ("Campbell") (collectively, "Defendants"), alleging violations of her

constitutional rights while she was committed at Mid-Hudson Psychiatric Center ("Mid-

Hudson"). (*See* Second Am. Compl. ("SAC") (Dkt. No. 51).) Before the Court is Defendants'

Motion To Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (Not.

of Mot. (Dkt. No. 72).) For the reasons that follow, the Motion is partially granted.

## I.  Background

### A.  Factual Background

The following facts are drawn from Plaintiff's SAC, and matters of which judicial notice may be taken, and are assumed to be true for the purposes of the instant Motion.

At the time of the relevant events, Plaintiff was a forensic patient at Mid-Hudson.  (*See* Compl. 4 (Dkt. No. 1).)  Mid-Hudson is a secure adult psychiatric hospital operated by the New York State Office of Mental Health ("OMH") that provides treatment to patients admitted by court order because they have been found unfit to stand trial, or not responsible by reason of mental defect, under § 730 of the New York Criminal Procedure Law ("CPL").  *See Lombardo v. Freebern*, No. 16-CV-7146, 2018 WL 1627274, at *2 (S.D.N.Y. Mar. 30, 2018).

On the morning of September 6, 2017, Plaintiff refused to get out of bed because she was "suffering from a nervous breakdown."  (SAC 1.)  Defendant Marlow then "slapped the left side of [her] face before using excessive force to put [her] in a wheelchair" and told her that he "tried to break [her] . . . wrists."  (*Id.*)  Marlow also announced that Plaintiff and her "God damn letter writing" had "no credibility," and falsely accused her of threatening to punch him in the face. (*Id.*)  In response to Marlow's accusation, Defendants Wallace and Huebner called a doctor to administer an injection to Plaintiff, even though they "knew" the accusation was false.  (*Id.*)

At approximately 9:20 a.m., Huebner pulled down Plaintiff's pajama pants "well beneath [her] butt crack" in order to administer the injection.  (*Id.*)  Plaintiff alleges that Huebner did so "to intentionally shame and humiliate" her, to "cause [her] pain," and to "mock [her] for the [benefit of the] male SHTAs holding [her]."  (*Id.*)  Plaintiff alleges that she "felt sexually assaulted" and "violated."  (*Id.*)  Defendant Franqui said, "Good work guys! Now we [can] finally can [give Plaintiff] meds over [her] objection[s]."  (*Id.*)

At 12:20 p.m., Plaintiff refused to go to lunch because the seven flights of stairs were "too much" for her.  (*Id.*)  A non-party SHTA, "Mr. Turnyae," put his knee into Plaintiff's back while Huebner administered a second injection.  (*Id.* 1–2.)  Plaintiff was then taken by wheelchair to the Special Services Unit ("SSU"), a "unit for the acutely mentally ill," where she remained for three weeks.  (*Id.* 2.)

Sometime in November 2017, Defendant Campbell was assigned to Plaintiff's ward. (*Id.*)  As Plaintiff returned from breakfast at approximately 9:20 a.m., another patient ("Shaw") stepped on the back of Plaintiff's boots three times, kicked Plaintiff, and knocked Plaintiff's hat off.  (*Id.*)  When Shaw refused to move and "remained behind [Plaintiff] on [her] back," Campbell radioed for the assistance of a senior SHTA, Defendant Franqui.  (*Id.*)

Shaw began to walk away, but upon reaching the stairwell, she suddenly began kicking and punching Plaintiff.  (*Id.*)  As Plaintiff turned around to defend herself, Campbell, "slammed" Plaintiff into the stairs "so hard that [her] back and tailbone were in severe pain . . . for nearly five weeks."  (*Id.*)  While Campbell restrained Plaintiff, another non-party SHTA, "Mr. Lowry" restrained Shaw.  (*Id.*)  When Franqui arrived, he asked Shaw "if she wanted to press charges" against Plaintiff, and Campbell filed a report identifying Plaintiff as the aggressor.  (*Id.*)

Campbell's report caused Wallace and Huebner to "insist[]" that Plaintiff "take medication."  (*Id.*)  Wallace and Huebner also "wrote a risk assessment that characterized [Plaintiff] as unpredictable and assaultive, and ordered [Plaintiff] to be on close-observation with no sharps and no hot liquid."  (*Id.*)  Wallace and Huebner renewed their assessment and order every three days for four weeks, despite the fact that neither was a member of Plaintiff's treatment team.  (*Id.*)  As a result of their assessment, Plaintiff was forced to "write with a crayon, sit by [her]self, and eat with [her] hands in the dining hall."  (*Id.*)  Plaintiff "also received

an ['']X[''], which is the loss of privileges for as long as [she] was on close observation," which was "about four weeks." (*Id.*) Plaintiff was prevented from filing charges against both Shaw and Campbell. (*Id.* at 3.) Eventually, Shaw told Plaintiff that Campbell "put her up to attacking [Plaintiff] with the promise of a sandwich and a soda." (*Id.*)

On an unspecified date, "[w]hile in the dining hall," Campbell mocked Plaintiff by stating that "[she] gave [her] daughter away for adoption" and "call[ing] [her] other derogatory names such as 'ugly Newburgh bitch.'" (*Id.*) On November 29, 2017, Campbell needlessly chose to walk near Plaintiff and "insult[ed] and "intimidate[ed] her." (*Id.*) Plaintiff alleges that Campbell's behavior is part of a "pattern of practice," that he "is under investigation for other brutal patient assaults" and "for instigating other patient[-]on[-]patient assaults," that he has "a history of abusing minors in his former employment," and that he is "incapable of refraining from harassing [Plaintiff] when he's around [her] with his words and body language." (*Id.*)

Plaintiff seeks punitive and compensatory damages and whatever other relief the Court deems proper. (*Id.*)

B. Procedural Background

Plaintiff filed her initial Complaint on October 19, 2017, (*see* Compl.), and an Application to proceed in forma pauperis ("IFP") on November 29, 2017, (Dkt. No. 7). On December 12, 2017, the Court made a preliminary finding that, because Plaintiff adequately pleaded imminent danger of serious physical injury, she was entitled to IFP status despite having filed three frivolous claims. *See* 28 U.S.C. § 1915(g). (Dkt. No. 9.) The Court noted, however, that its decision to do so was "without prejudice to Defendants' making a motion seeking to revoke Plaintiff's IFP status" or to dismiss. (*Id.*)

On February 6, 2018, the Court directed Plaintiff to file an amended complaint by February 28, 2018. (Dkt. No. 20.) On March 15, 2018, the Court docketed Plaintiff's Amended Complaint, which contains a return address in Newburgh, New York, thereby indicating that she had been released from Mid-Hudson. (Am. Compl. 4 (Dkt. No. 21).) On May 24, 2018, Defendants filed a Motion to Revoke Plaintiff's IFP Status and Dismiss Plaintiff's Amended Complaint. (Dkt. Nos. 37–40.) On March 18, 2019, the Court granted Defendants' Motion to Revoke Plaintiff's IFP Status without prejudice, but permitted Plaintiff to renew the Action within 30 days if she paid the appropriate filing fee or submitted an IFP Application indicating her inability to do so. (Dkt. No. 46.)

On April 12, 2019, Plaintiff filed the operative SAC and an IFP Application. (Dkt. No. 51.) On April 16, 2019, the Court again granted Plaintiff IFP status. (Dkt. No. 52). On August 15, 2019, Defendants filed the instant Motion and accompanying papers. (Dkt. No. 72–73.) On August 26, 2019, Plaintiff filed a paper, styled "Motion for Summary Judgment," which the Court construed as Plaintiff's Opposition. (Dkt. Nos. 76, 80.) On October 10, 2019, Defendants filed a Reply. (Dkt. No. 81.) Plaintiff has since filed several additional letters, all of which the Court has reviewed and considered in deciding the instant Motion. (Dkt. Nos. 83–88).

## II. Discussion

### A. Standard of Review

The Supreme Court has held that although a complaint "does not need detailed factual allegations" to survive a motion to dismiss, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration and quotation marks omitted). Indeed, Rule 8 of the Federal Rules of Civil Procedure

"demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration and quotation marks omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed," *id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" (second alteration in original) (citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))); *id.* at 678–79 ("Rule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, but it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

"[W]hen ruling on a defendant's motion to dismiss, a judge must accept as true all of the factual allegations contained in the complaint," *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam), and "draw[] all reasonable inferences in favor of the plaintiff," *Daniel v. T&M Prot. Res., Inc.*, 992 F. Supp. 2d 302, 304 n.1 (S.D.N.Y. 2014) (citing *Koch v. Christie's Int'l PLC*, 699 F.3d 141, 145 (2d Cir. 2012)). Additionally, "[i]n adjudicating a Rule 12(b)(6) motion, a district court must confine its consideration to facts stated on the face of the complaint, in

documents appended to the complaint or incorporated in the complaint by reference, and to matters of which judicial notice may be taken." *Leonard F. v. Isr. Disc. Bank of N.Y.*, 199 F.3d 99, 107 (2d Cir. 1999) (quotation marks omitted); *see also Wang v. Palmisano*, 157 F. Supp. 3d 306, 317 (S.D.N.Y. 2016) (same). However, when the complaint is from a pro se plaintiff, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint." *Alsaifullah v. Furco*, No. 12-CV-2907, 2013 WL 3972514, at *4 n.3 (S.D.N.Y. Aug. 2, 2013) (quotation marks omitted).

Where, as here, a plaintiff proceeds pro se, the court must "construe[] [her] [complaint] liberally and interpret[] [it] to raise the strongest arguments that [it] suggest[s]." *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quotation marks omitted). However, "the liberal treatment afforded to pro se litigants does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013) (quotation marks omitted); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and quotation marks omitted)).

B. Analysis

Defendants argue that all official capacity claims are barred by the Eleventh Amendment; that Defendants Franqui and Wallace were not alleged to be personally involved in the purported constitutional violations; and that Plaintiff's allegations do not support claims for excessive force or impermissible medical treatment under the Fourteenth Amendment. (*See generally* Defs.' Mem. of Law in Supp. of Mot. To Dismiss ("Defs.' Mem.") 5–12 (Dkt. No. 73).) The Court considers these arguments to the extent necessary for resolution of the Motion.

## 1. Official Capacity Claims

As a threshold matter, insofar as Plaintiff pursues claims against Defendants in their official capacities, such claims are precluded by the Eleventh Amendment.  "[A]s a general rule, state governments may not be sued in federal court unless they have waived their Eleventh Amendment immunity, or unless Congress has abrogated the states' Eleventh Amendment immunity when acting pursuant to its authority under Section 5 of the Fourteenth Amendment." *Gollomp v. Spitzer*, 568 F.3d 355, 366 (2d Cir. 2009) (citation, alteration, and quotation marks omitted).  "Courts have routinely held that New York has not waived, and Congress has not abrogated, sovereign immunity with respect to claims for constitutional violations under [§§] 1981, 1983, or 1985." *Carnell v. Myers*, No. 17-CV-7693, 2019 WL 1171489, at *4 (S.D.N.Y. Mar. 13, 2019) (citation and quotation marks omitted); *see also Murray v. Thomason*, No. 17-CV-7004, 2018 WL 5113955, at *4 (S.D.N.Y. Oct. 19, 2018) (same).  Mid-Hudson is operated by OMH, an agency of New York State.  *See Babcock v. N. Y. State Office of Mental Health*, No. 04-CV-2261, 2009 WL 1598796, at *26 (S.D.N.Y. June 8, 2009) (stating that psychiatric facilities established within OMH are state agencies protected by the Eleventh Amendment); *Vallen v. Mid-Hudson Forensic Office of Mental Health*, No. 02-CV-5666, 2004 WL 1948756, at *3 (S.D.N.Y. Sept. 2, 2004) ("By statute the Mid-Hudson Forensic Psychiatric Center is a 'hospital' within the 'office' of the Commissioner of OMH.  It is a state facility and entitled to the state's immunity." (citation omitted)).  As employees of OMH facilities, Defendants are state officials and claims against Defendants in their official capacities are barred by the Eleventh Amendment.  *See McNair v. Kirby Forensic Psychiatric Ctr.*, No. 09-CV-6660, 2010 WL 4446772, at *7 (S.D.N.Y. Nov. 5, 2010) ("The individual defendants, all of whom are employees of OMH, have been sued in both their official as well as individual capacities.").  Accordingly,

"[b]ecause the Eleventh Amendment bars claims against state employees sued in their official capacities, [P]laintiff's claims against [Defendants] in their official capacities must be dismissed." *Id.* (footnote omitted).

### 2. Excessive Force Claims

"The rights of patients who are involuntarily committed have been likened to the rights of detainees awaiting trial." *Lombardo*, 2018 WL 1627274, at *15 (citations and quotation marks omitted); *see also Buthy v. Comm'r of Office of Mental Health of N.Y. State*, 818 F.2d 1046, 1050–51 (2d Cir. 1987) (applying Due Process Clause protections afforded to pre-trial detainees to persons confined due to incompetence to stand trial or acquittal by reason of insanity). Thus, like pretrial detainees, Plaintiff's rights under the Due Process Clause are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017) (citation omitted).

In bringing a claim for excessive force under the Fourteenth Amendment, a plaintiff must allege that force was applied "purposefully, knowingly, or (perhaps) recklessly" because "accidental or negligent acts are not subject to Fourteenth Amendment liability." *Edrei v. Maguire*, 892 F.3d 525, 534 (2d Cir. 2018) (citation omitted), *cert. denied*, 139 S. Ct. 2614 (2019). A plaintiff must also allege facts suggesting that the use of force was "objectively unreasonable" under the circumstances. *Kingsley v. Hendrickson*, 135 S. Ct. 2466, 2473 (2015). The Supreme Court has suggested that the following factors bear on the objective reasonableness of force used: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Id.* at 2473. Moreover, courts

considering the reasonableness of force under the Fourteenth Amendment must account for the "legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that . . . are needed to preserve internal order and discipline and to maintain institutional security." *Id.* (citation, alterations, and quotation marks omitted). Additionally, claims for excessive force under the Fourteenth Amendment must involve force that is either "more than *de minimis*" or "repugnant to the conscience of mankind." *United States v. Walsh*, 194 F.3d 37, 48 (2d Cir. 1999) (citation and quotation marks omitted); *see also Lynch v. City of New York*,— F.3d —, 2020 WL 1036620, at *7–8 (2d Cir. Mar. 4, 2020) (explaining that "there is a *de minimis* level of imposition with which the Constitution is not concerned," and therefore holding that a protestor who was detained for five hours and punitively denied food, drink, and access to a bathroom failed to state a Fourteenth Amendment claim (citation and quotation marks omitted)); *Rahman v. Schriro*, 22 F. Supp. 3d 305, 314–15 (S.D.N.Y. 2014) (explaining that "*de minimis* uses of force are necessarily excluded from constitutional recognition" (citation omitted)).[1]

---

[1] Although the protections offered by the Fourth, Eighth and Fourteenth Amendments differ in substantial ways, courts generally consider Fourth and Eighth Amendment excessive force cases instructive when determining what constitutes de minimis force, or force that is reasonable under the circumstances, for Fourteenth Amendment purposes as well. *See Edrei*, 892 F.3d at 542 (noting "the practice of the Supreme Court and [the Second] Circuit, both of which cross-pollinate between Fourth, Eighth, and Fourteenth Amendment contexts" with respect to claims of excessive force); *Darnell*, 849 F.3d at 34 (explaining that Eighth Amendment cases are relevant to Fourteenth Amendment claims insofar as "they address the practical importance of taking into account the legitimate safety-related concerns of those who run jails"); *Walsh*, 194 F.3d at 48 (explaining that the same standards apply, under both the Eighth and Fourteenth Amendment, in determining the objective reasonableness of force in ensuring prison discipline); *see also Graham v. Connor*, 490 U.S. 386, at 398 (1989) (explaining that Fourth Amendment standards are stricter than Eighth and Fourteenth Amendment standards); *Shakir v. Derby Police Dep't*, 284 F. Supp. 3d 165, 209 (D. Conn. 2018) (same).

<u>a.  Marlow</u>

Under these standards, Plaintiff cannot sustain an excessive force claim against Marlow.

With respect to Marlow, Plaintiff alleges only that when she refused to get out of bed, Marlow

"slapped the left side of [her] face before using excessive force to put [her] in a wheelchair" and

told her that he "tried to break [her] . . . wrists."  (SAC 1.)  Courts have repeatedly held that a

single slap that results in no injury constitutes inactionable, *de minimis* force.  *See Santiago v.*

*City of Yonkers*, No. 13-CV-1077, 2015 WL 6914799, at *8 (S.D.N.Y. Oct. 30, 2015)

(explaining, in the context of the Fourth Amendment, that "an open-handed slap . . . with no

medical evidence and no other evidentiary support of injury, does not rise to the level of a

constitutional violation." (citation and quotation mark omitted)); *Benjamin v. Flores*, No. 11-CV-

4216, 2012 WL 5289513, at *3 (E.D.N.Y. Oct. 23, 2012) (holding that a single slap that resulted

in "no injury at all" was insufficient to state a Fourteenth Amendment claim); *Santiago v. C.O.*

*Campisi Shield No. 4592*, 91 F. Supp. 2d 665, 674 (S.D.N.Y. 2000) (explaining that "an open-

handed slap" is insufficient to give rise to an excessive force claim under both the Eighth and

Fourteenth Amendments (citation omitted)); *see also Vallen v. Newson*, Nos. 16-CV-2632, 16-

CV-2893, 2019 WL 1317569, at *4 (E.D.N.Y. Mar. 22, 2019) ("Courts have held that isolated,

*de minimus* [sic] uses of force against involuntarily committed plaintiffs do not constitute

excessive force and are thus not constitutional deprivations." (citation omitted)); *cf. Ben-Reuben*

*v. Westchester County*, No. 17-CV-9156, 2019 WL 1406868, at *4 (S.D.N.Y. Mar. 28, 2019)

(declining to dismiss an excessive force claim based on an alleged slap where the court could not

determine the extent of the injuries from the complaint, and because the alleged use of force was

"entirely gratuitous" (citation omitted)).  Moreover, here, Plaintiff acknowledged that she was

actively resisting instructions at the time of the incident, (*see* SAC 1 ("I refused to get out of bed

. . .")), suggesting that the use of some force by facility personnel was reasonable under the circumstances, *see Kingsley*, 135 S. Ct. at 2473 (encouraging courts to consider "whether the plaintiff was actively resisting" in analyzing the reasonableness of force under the Fourteenth Amendment); *Kalwasinski v. Artuz*, No. 02-CV-2582, 2003 WL 22973420, at *6–7 (S.D.N.Y. Dec. 18, 2003) (holding that a prison official did not use excessive force in violation of the Eighth Amendment when he pressed prisoner's face into wall while attempting to secure the prisoner's compliance).

Similarly, Plaintiff's claim that Marlow used "excessive force to put [her] in a wheelchair," (SAC 1), fails because it is a classic example of a conclusory allegation. *See Gulley v. Lizon*, No. 19-CV-310, 2019 WL 1559432, at *3 (D. Conn. Apr. 10, 2019) (explaining that the plaintiff's excessive force claim "consists of one conclusory statement" and that "[a] conclusory statement is insufficient to state a plausible claim for use of excessive force"); *see also Iqbal*, 556 U.S. at 678 (explaining that Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation" (citation omitted)). In any case, the allegation that Marlow "merely push[ed] Plaintiff back into [her] wheelchair, without more," is de minimis and therefore insufficient to state a constitutional violation. *Vallen*, 2019 WL 1317569, at *4; *see also Wilkins v. Gaddy*, 559 U.S. 34, 38 (2010) (explaining, in an Eighth Amendment context, that an "inmate who complains of a push or shove that causes no discernible injury almost certainly fails to state a valid excessive force claim." (citation and quotation marks omitted)). Similarly, Plaintiff's allegations that Marlow cursed at her, threatened to break her wrists, announced she had "no credibility," and reprimanded her for writing letters cannot support a claim because "[i]n this Circuit, allegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged." *Walker v. Fierro*, No. 17-CV-05245, 2019 WL 6841798,

at *3 (S.D.N.Y. Dec. 13, 2019) (quotation marks omitted) (citing, inter alia, *Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986)); *Whitaker v. Campbell*, No. 19-CV-1357, 2019 WL 5696035, at *3 (D. Conn. Nov. 4, 2019) (same); *see also Williams v. Dubray*, 557 F. App'x 84, 86 (2d Cir. 2014) (expressly applying the same principle in a Fourteenth Amendment context).

### b. Campbell

With respect to Campbell, however, Plaintiff has adequately alleged an excessive force violation. First, Plaintiff alleges that Campbell "slammed [Plaintiff] to the stairs[] so hard that [her] back and tailbone were in severe pain . . . for nearly five weeks." (SAC 2.) To be sure, Plaintiff admits that Campbell purportedly did so in order to separate Plaintiff and another inmate engaged in an altercation. (*See id.*) Ordinarily, the use of limited force in such situations may be considered reasonable. *See Barnes v. Harling*, 368 F. Supp. 3d 573, 593 (W.D.N.Y. 2019) ("It is beyond dispute that attempting to stop an inmate fight is a legitimate governmental objective for a Corrections Officer." (citation, alterations, and quotation marks omitted)); *Vargas v. N. Y. C. Dep't of Corr.*, No. 17-CV-2544, 2018 WL 3392873, at *3 (S.D.N.Y. July 12, 2018) (explaining that a use of force was "objectively reasonable because [the defendant] was attempting to stop an inmate fight, which is a legitimate governmental objective" and because the defendant "did not use more force than necessary to quell the inmate altercation"), *appeal dismissed*, No.18-2334 (2d Cir. Oct. 18, 2018). Here, however, several additional allegations plausibly suggest that Campbell's use of force may have been objectively unreasonable. First, Plaintiff alleges a prior history of altercations between herself and Campbell. (*See* SAC 2 (explaining that Plaintiff had previously filed a complaint against Campbell after an incident where Campbell closed a gym door on, and then twisted, Plaintiff's arm).) Insofar as this prior history adds plausibility to Plaintiff's claim that Campbell tackled her "for the very purpose of

causing harm," such allegations also suggest that his conduct was "objectively unreasonable." *Kingsley*, 135 S. Ct. at 2476 (explaining that indications of a "purpose to cause harm . . . might help show that the use of force was excessive" (citations and quotation marks omitted)).

Second, Plaintiff alleges that Campbell *initiated* the altercation between Plaintiff and Shaw. (*See* SAC 3 (explaining that Shaw maintains that Campbell "put her up to attacking [Plaintiff] with the promise of a sandwich and a soda"). Taken as true, these allegations suggest that Campbell's use of force may not have been a reasonable attempt to maintain order, but rather the culmination of a premeditated plan to inflict physical harm on Plaintiff. If so, the use of force was not the pursuit of "legitimate interests that stem from the government's need to manage the facility." *Kingsley*, 135 S. Ct. at 2473 (citation, alteration, and quotation marks omitted). On the contrary, Campbell's conduct was "intended to injure in some way unjustifiable by any government interest." *Edrei*, 892 F.3d at 533 (citation and quotation marks omitted). Accordingly, insofar as Plaintiff seeks to pursue a claim against Campbell based on this incident, that claim survives the instant Motion.[2]

### 3. Unwanted Medical Treatment

In general, individuals—including prisoners— "retain a Fourteenth Amendment right to refuse medical treatment." *Perkins v. Perez*, No. 17-CV-1341, 2020 WL 248686, at *6 (S.D.N.Y. Jan. 16, 2020) (citing *Pabon v. Wright*, 459 F.3d 241, 251 (2d Cir. 2006)); *see also Washington v. Harper*, 494 U.S. 210, 229 (1990) ("The forcible injection of medication into a

---

[2] Because the right to be free from excessive force is clearly established, *see Kingsley*, 135 S. Ct. at 2470, and because Plaintiff has alleged that Campbell's conduct was intentional, (*see* SAC 3), Campbell's conduct cannot have been "based on reasonable mistakes of law or fact," *Naumovski v. Norris*, 934 F.3d 200, 210 (2d Cir. 2019) (footnote omitted). Accordingly, his claim of qualified immunity fails.

nonconsenting person's body represents a substantial interference with that person's liberty.")
However, "[i]f an involuntarily committed psychiatric patient is acting in a manner in which he
is dangerous to himself and those around him, psychiatrists may administer emergency
medication against the patient's will without violating his rights." *Muhammad v. New York City*,
No. 15-CV-5603, 2016 WL 4367970, at *3 (S.D.N.Y. Aug. 12, 2016) (citation omitted); *see also*
*Washington*, 494 U.S. at 227 (holding that "the Due Process Clause permits the State to treat a
prison inmate who has a serious mental illness with antipsychotic drugs against his will, if the
inmate is dangerous to himself or others and the treatment is in the inmate's medical interest").
Moreover, the Supreme Court has emphasized that decisions concerning the treatment of
committed individuals should be "made by medical professionals rather than a judge," assuming
adequate procedural safeguards exist. *Id.* at 231. Thus, "decisions of professionals are
presumptively valid and will result in liability only when the decision . . . is such a substantial
departure from accepted professional judgment, practice, or standards as to demonstrate that the
person responsible actually did not base the decision on such a judgment." *Lombardo*, 2018 WL
1627274, at *18 (quotation marks omitted) (ultimately quoting *Youngberg v. Romeo*, 457 U.S.
307, 320 (1982)).

Here, Plaintiff alleges that several individuals were involved in the administration of
unwanted treatments. For example, Plaintiff alleges that Marlow falsely accused her of
threatening to "punch him in the face." (SAC 1.) She further alleges that although Wallace and
Huebner "knew" that Marlow's accusation was false, they nevertheless "called the doctor and
[Plaintiff] received an injection based on the allegations." (*Id.*) Huebner administered the
injection, and at some point thereafter, Franqui allegedly exclaimed, "Good work guys! Now we

[can] finally can [give Plaintiff] meds over [her] objection[s]." (*Id.*) Additionally, later that day, Huebner gave Plaintiff "a second shot, because [Plaintiff] refused to move again." (*Id.* at 2.)

These allegations support a claim against Marlow, but not against the rest of the Defendants. With respect to Marlow, the SAC suggests that Marlow fabricated the basis on which a decision was reached to administer the disputed injection. If so, and if Marlow's accusation was indeed the sole basis for the treatment decision, then Marlow was directly responsible for ensuring that the treatment decision was *not* based on a proper "professional judgment" of Plaintiff's situation, *Youngberg*, 457 U.S. at 321–22, and was therefore without a rational connection to a "legitimate governmental objective," *Edrei*, 892 F.3d at 535. Marlow would thereby have participated directly in a constitutional violation—even if those administering the injection were entirely innocent. *See Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) (explaining that "a person who, with knowledge of the illegality, participates in bringing about a violation of the victim's rights but does so in a manner that might be said to be 'indirect'—such as ordering or helping others to do the unlawful acts, rather than doing them him—or herself" may be held liable under § 1983); *see also Case v. City of New York*, 233 F. Supp. 3d 372, 397 (S.D.N.Y. 2017) (denying a motion to dismiss a false arrest claim where the plaintiff alleged that a defendant officer "processed his arrest" even though that officer "may not have been present when [the plaintiff] was seized" (citations omitted)). Plaintiff has therefore adequately pleaded a Fourteenth Amendment claim against Marlow.[3]

---

[3] Because the right to refuse unwanted and unnecessary medical treatment is clearly established, *see Washington*, 494 U.S. at 229; *Pabon*, 459 F.3d at 251, and because Plaintiff has alleged that Marlow's conduct was intentional, (*see* SAC 1), Marlow's conduct cannot have been "based on reasonable mistakes of law or fact," *Naumovski*, 934 F.3d at 210 (footnote omitted). Accordingly, his claim of qualified immunity fails.

Plaintiff's unwanted medical treatment claims against all other Defendants, however, fail as a matter of law. "It is well settled that, in order to establish a defendant's individual liability in a suit brought under § 1983, a plaintiff must show . . . the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). "[D]irect participation as a basis of liability in this context requires intentional[, grossly negligent, or deliberately indifferent] participation in the conduct constituting a violation of the victim s rights by one who knew of the facts rendering it illegal." *Provost*, 262 F.3d at 155 (footnote omitted); *see also Grullon*, 720 F.3d at 138 (explaining that liability under § 1983 can exist for grossly negligent or deliberately indifferent conduct). Here, Plaintiff has provided no non-conclusory allegations to suggest that any Defendant other than Marlow had reason to know the injection might be improper. Indeed, Plaintiff acknowledges that several medical professionals involved in the decision to administer the injection, (*see* SAC 1); thus, that decision was "presumptively valid." *Lombardo*, 2018 WL 1627274, at *18 (ultimately quoting *Youngberg*, 457 U.S. at 320). While Plaintiff asserts that Wallace and Huebner "knew" that Marlow's accusation was false, Plaintiff provides no facts to support this assertion. (SAC 1.) The assertion is therefore conclusory and should be discounted. *See Boykin v. Moreno*, No. 17-CV-6869, 2020 WL 882195, at *7 (S.D.N.Y. Feb. 24, 2020) (explaining that "conclusory allegations of [D]efendants' knowledge are insufficient" (alteration in original) (citation and quotation marks omitted)). Relatedly, while Plaintiff alleges that Franqui expressed happiness at the opportunity to administer treatment "over [Plaintiff's] objection," the alleged statement was only made after the treatment had already occurred. (SAC 1.) Moreover, Plaintiff does not allege that Franqui was involved in the decision to administer the unwanted injection, or that he had reason to know that the basis for that injection might be fabricated. (*See id.*) Therefore,

from the perspective of Wallace, Huebner and Franqui, the treatment was properly authorized and objectively reasonable. Accordingly, as alleged, these Defendants were not personally involved in a constitutional violation. *See Anthony v. City of New York*, 339 F.3d 129, 142 (2d Cir. 2003) (explaining that because facility staff "reasonably believed that [the plaintiff] was a danger to herself or to others, . . . the involuntary hospitalization was therefore constitutional under the Fourteenth Amendment"). Moreover, insofar as these Defendants were involved in such a violation, such involvement "was based on reasonable mistakes of . . . fact," and so they are shielded by qualified immunity. *Naumovski*, 934 F.3d at 210 (footnote omitted). All claims against Defendants other than Marlow based on unwanted medical treatment are therefore dismissed.

### 4. Sexual Assault

In *Crawford v. Cuomo*, 796 F.3d 252 (2d Cir. 2015), the Second Circuit explained that an inmate pursuing a sexual abuse claim under the Eighth Amendment must allege both subjective and objective elements, namely that the "officer's intentional contact with an inmate's genitalia or other intimate area . . . serves no penological purpose and is undertaken with the intent to gratify the officer's sexual desire or humiliate the inmate[.]" 796 F.3d at 257. In general, protections under the Fourteenth Amendment are "at least as great as the Eighth Amendment protections available to a convicted prisoner." *Darnell*, 849 F.3d at 29 (citation and quotation marks omitted). However, it is presently unclear whether both prongs required for Eighth Amendment sexual abuse claims are also required for claims of "sexual abuse under the Fourteenth Amendment." *See Gilliam v. Black*, No. 18-CV-1740, 2019 WL 3716545, at *10 (D. Conn. Aug. 7, 2019) (discussing the effect of *Kingsley* on Fourteenth Amendment sexual abuse claims and noting a lack of clarity concerning whether the same elements are necessary)

(citations omitted); *Holland v. City of New York*, 197 F. Supp. 3d 529, 546 (S.D.N.Y. 2016) (noting that it is unclear whether "sexual abuse claims of a pretrial detainee must still meet both the objective and subjective prongs of the traditional Eighth Amendment analysis" (footnote omitted)).

Here, Plaintiff's claims cannot survive under either prong. Plaintiff alleges only that, in the process of administering an injection, Huebner "pulled [Plaintiff's] pajamas down well beneath [her] butt crack and injected [her];" and that she do so "to intentionally shame and humiliate" her, to "cause [her] pain," and to "mock [her] for the [benefit of the] male SHTAs holding [her]." (SAC 1.) In acknowledging that Huebner's contact with Plaintiff's "intimate area" came in the context of an injection, Plaintiff acknowledges that Huebner's actions served, at least facially, a legitimate purpose. *Crawford*, 796 F.3d at 257; *see also Washington*, 494 U.S. at 226 (recognizing "the State's legitimate interest in treating [a committed individual] where medically appropriate for the purpose of reducing the danger he poses"). Moreover, the Supreme Court has emphasized that "courts must show deference" to the professional judgment of medical practitioners in the context of such treatment. *Youngberg*, 457 U.S. at 322. Accordingly, Plaintiff's allegations have not satisfied the "objective" prong of a Fourteenth Amendment sexual abuse claim, i.e., that Huebner's conduct served "no penological purpose." *Crawford*, 796 F.3d at 257.

With respect to the "subjective" prong, Plaintiff does not allege any overtly sexual comments or conduct; rather, she simply asserts knowledge of Huebner's intent and state of mind in conclusory fashion. (*See* SAC 1 ("[Huebner] did this to intentionally shame and humiliate me, and to cause me pain.").) Absent supporting factual allegations, such conclusory statements are insufficient. *See Grant v. Norfleett*, No. 17-CV-328, 2017 WL 1902150, at *3 (D.

Conn. May 9, 2017) (granting a motion to dismiss where the sexual abuse claim was based on a conclusory allegation that the defendants conducted the search for their own sexual gratification, and the assertion that on occasions after the plaintiff was strip searched, the defendants "watched him like a piece of meat" (quotation marks omitted)); *see also Shaw v. Prindle*, 661 F. App'x 16, 19 (2d Cir. 2016) (noting that the court "cannot infer solely from the thoroughness of the search"—described, inter alia, as "excessive searching of [the] crotch area"—that the defendant "intended to search . . . with intent to arouse or gratify [his] sexual desires or to humiliate [the plaintiff]" (quotation marks omitted)); *cf. Crawford*, 796 F.3d at 257–58 (finding an Eighth Amendment violation where the defendant "fondl[ed] and squeeze[d] [the plaintiff's] penis in order to make sure [he] did not have an erection," because "[t]here is no penological justification for checking to see if an inmate has an erection" (alteration and quotation marks omitted)); *id.* at 258–59 (noting that demeaning, overtly sexual comments "suggest[ed] that [the defendant] undertook the search in order to arouse himself, humiliate [the plaintiff], or both" (record citation omitted)). Accordingly, the Court dismisses Plaintiff's Fourteenth Amendment claim of sexual abuse.

## 5. Remaining Allegations

Plaintiff's remaining allegations fail to state a claim altogether. While Plaintiff alleges that, at some unspecified time, Wallace and Huebner "insisted that [she] take medication," (SAC 2), Plaintiff offers no further details, rendering the allegations impermissibly threadbare, *see Neal v. Asta Funding, Inc.*, No. 13-CV-2176, 2014 WL 3887760, at *4 (S.D.N.Y. June 17, 2014) (explaining that "threadbare allegations fail even to satisfy the liberal 'plausibility' pleading standard" (citing *Twombly*, 550 U.S. at 547)). At best, "Plaintiff's claims boil down to nothing more than a dispute . . . over the treatment [she] has received. . . . [S]uch disagreement regarding

the particularities of [her] treatment is insufficient to state a claim." *Lombardo*, 2018 WL 1627274, at *19 (citing, inter alia, *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998)). Similarly, while Plaintiff alleges that Wallace and Huebner's risk assessment led to various restrictions on Plaintiff's activities and privileges, (SAC 2), these restrictions do not amount to constitutional deprivations, *see id.* at *18 (noting that an individual committed in Mid-Hudson had "constitutionally-protected liberty interests in adequate food, shelter, clothing, medical care, and conditions of reasonable care and safety," but that the loss of various privileges did not amount to a deprivation of protected liberty interests or pose an unreasonable risk of serious damage to health (citation and quotation marks omitted)); *see also Falls v. Campbell*, No. 17-CV-35, 2019 WL 6251245, at *6 (S.D.N.Y. Nov. 21, 2019) (rejecting Fourteenth Amendment claims based on the denial of commissary and telephone privileges and other minor disciplinary measures). Finally, while Plaintiff alleges that Campbell called Plaintiff "derogatory names" and "insult[ed] and intimidate[ed]" her, (SAC 3), "verbal harassment or profanity alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and is therefore not actionable," *Vogelfang v. Capra*, 889 F. Supp. 2d 489, 508 (S.D.N.Y. 2012) (citation and quotation marks omitted); *see also Walker*, 2019 WL 6841798, at *3 ("In this Circuit, allegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged." (citation and quotation marks omitted)). Accordingly, any purported claims based on these allegations are dismissed.

### III.  Conclusion

For the reasons stated above, Defendants' Motion To Dismiss is partially granted and partially denied.  Plaintiff may proceed with a claim for administration of unwanted medical

treatment against Marlow based on the September 6, 2017 incident. Similarly, Plaintiff may proceed with a claim for excessive use of force against Campbell based on the November 2017 incident involving Plaintiff and Shaw. All other claims, including any official capacity claims and all claims against Huebner, Franqui and Wallace, are dismissed.

Because this is the first adjudication on the merits of Plaintiff's claims, the dismissals are without prejudice. If Plaintiff wishes to file a third amended complaint, Plaintiff must do so within 30 days of the date of this Opinion & Order. Plaintiff should include within that third amended complaint all changes to correct the deficiencies identified in this Opinion & Order that Plaintiff wishes the Court to consider. Plaintiff is advised that the third amended complaint will replace, not supplement, the SAC. The third amended complaint must contain *all* of the claims, factual allegations, and exhibits that Plaintiff wishes the Court to consider. If Plaintiff fails to abide by the 30-day deadline, the dismissed claims may be dismissed with prejudice, and the Action will proceed on the remaining claims.

The Clerk is respectfully directed to terminate the pending Motion, (Dkt. No. 72), as well as Plaintiff's purported "Motion for Summary Judgment," (Dkt. No. 76)). The Clerk is also requested to mail a copy of this Opinion & Order to Plaintiff.

SO ORDERED.

DATED:     March 16, 2020
          White Plains, New York

KENNETH M. KARAS
UNITED STATES DISTRICT JUDGE